UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JENNIFER EDWARDS,

                  Plaintiff,                      Case No. 17-cv-10648

v.                                      Honorable Thomas L. Ludington

ALDI, INC., a foreign Corporation,

                  Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
GRANTING MOTION TO FILE SUPPLEMENTAL EXHIBITS, DENYING MOTION
FOR AMENDED SCHEDULING ORDER AS MOOT, DENYING MOTION IN LIMINE
AS MOOT, AND DISMISSING COMPLAINT**

On March 1, 2017, Plaintiff Jennifer Edwards filed a complaint against Defendant ALDI,

Inc., alleging various violations of the Family Medical Leave Act (FMLA). Compl., ECF No. 1.

Plaintiff alleges Defendant interfered with her exercise of her right to take leave under the

FMLA, and retaliated against her for doing so by terminating her employment. *Id.* Plaintiff also

alleges she was terminated for refusing to be complicit in fraudulent activity, in violation of

public policy, and that she was discriminated against based on her disability. *Id.* After eight

months of discovery, Defendant moved for summary judgment on February 19, 2018. ECF No.

27.[1] Plaintiff responded on March 12, and Defendant replied on March 26. ECF Nos. 31, 32.[2]

---

[1] Defendant also moved to amend the Scheduling order to accommodate Defense Counsel's scheduling conflict.
ECF No. 26.
[2] On April 20, 2018, Plaintiff moved to file supplemental medical records. ECF No. 33. Defendants oppose the
motion. ECF No. 34. Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or
identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to
supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."
The motion indicates that it was brought to Plaintiff's attention after filing the response brief that some of the
records had not been produced by the Heritage Family Physicians despite the fact that Plaintiff had requested them.
They were not produced because the treating physician had left the practice and the records were being maintained
by a third-party group. This is a sufficient justification for the delay. The majority of these records concern
Plaintiff's September 2013 hospital visit, about which Plaintiff testified during her deposition. These records contain

**I.**

ALDI hired Plaintiff as a cashier in October of 2011, and she was ultimately promoted to store manager. Edwards Dep. at 184, 189–92. ECF No. 27-2. She was assigned to several different store locations before ending up at store 56 in Saginaw, Michigan, where she remained until the date of her termination in October of 2015. *Id.* at 95. Brian Anderson was the District Manager in charge of Plaintiff's district until February of 2015 when Skylar VanNatta became District Manager. *Id.* at 54.

Plaintiff was involved in an automobile accident in 2009. Edwards Decl., ECF No. 31-15. Since that accident Plaintiff has suffered from a variety of maladies related to her ears, including "excruciating discomfort, excess draining, infected ear drums, several perforations of eardrums, lymph node swelling and infections throughout the neck, mastoiditis bilateral, headache." *Id.* at 33. Infection of the middle ear can lead to a more serious condition known as mastoiditis, a bacterial infection of the mastoid air cells surrounding the inner and middle ear.

Plaintiff was diagnosed with bilateral mastoiditis in September of 2013. Med. Recs., ECF No. 33-1 at PGID 1497-1510. She reported to the emergency room at St. Mary's of Michigan on September 13, where she was hospitalized from September 14–16. *Id.*; Edwards Dep. at 35-36, 39. The mastoiditis did not impact her ability to perform her job as store manager and did not impact her ability to perform daily life activities outside of work. Edwards Dep. at 36-37. She was treated with antibiotics. *Id.* at 37. After she was discharged on September 16, 2013, her doctor imposed no work restrictions on her and she went back to work. *Id.* at 42.

In November of 2013, Plaintiff's Doctor stated as follows: "My impression is that this patient has bilateral chronic otitis externa as well as significant temporomandibular joint

---

little novel information. The remainder of the records do not appear to have any impact on the analysis contained herein, and Plaintiff makes no attempt at explaining the relevance of these records. Thus, the delayed production of these records is harmless, and the motion will be granted.

dysfunction as a cause of her underlying, ongoing complaints of otorrhea and ear fullness and pressure and mild ache. She developed an episode of acute otitis media in September which is now completely resolved." Medical Records, ECF No. 31-5 at PGID 1384. On May 19, 2015, Plaintiff reported to the emergency room at St. Mary's, was diagnosed with acute persistent otitis media and otitis externa, was discharged with instructions to follow up with a primary care provider in 2 days, and was instructed to continue antibiotics and eardrops. *Id.* at PGID 1397. On May 22, 2015, she reported to the emergency room again where she was diagnosed with mastoiditis and transferred to the University of Michigan Hospital. *Id.* at PGID 1406; Edwards Dep. at 42-43. She was not admitted to the hospital on that occasion. Med. Recs at PGID 1410-17, ECF No. 31-5. The University of Michigan did not confirm the diagnosis of mastoiditis, but diagnosed her with otitis media with spontaneous rupture of eardrum. Discharge Instructions, ECF No. 27-3. She was discharged and prescribed antibiotics. *Id.* Her condition did not impact her ability to perform he job as store manager. Edwards Dep. at 46. When asked if the condition impacted her ability to perform daily life activities, she responded that she "pushed through, pain or no pain." *Id.* No doctor ever told her that she had work restrictions due to her ear conditions. *Id.* at 58.

In conjunction with her September, 2013 diagnosis, Plaintiff never submitted any medical records or doctors notes to ALDI explaining that she had been in the hospital. *Id.* at 63. Plaintiff testified that she did miss work in 2014 for hospital stays though she could not recall when. *Id.* at 65-66. She did not indicate that she requested FMLA leave in conjunction with her September, 2013, diagnosis or 2014 hospital visits. *Id.*

On April 10, 2014, Plaintiff reported to the Covenant Healthcare Emergency Department and was diagnosed with otitis media and infective otitis externa, unspecified. She was discharged and prescribed antibiotics and Norco for pain. Med. Recs at PGID 1385-87, ECF No. 31-5.

Plaintiff testified regarding a computer printout of the work schedule for the week of May 22, 2015. She testified that the printout is dated June 17, 2015 and bears a handwritten note in Ms. VanNatta's handwriting indicating that Plaintiff was on vacation in Colorado that week. Edwards Dep. at 67. Ms. VanNatta also wrote a status memo "removing" Plaintiff's pay for that week. *Id.* at 68. Plaintiff could not confirm that she was scheduled to work on May 22, but she testified that she was not on vacation. *Id.* at 68. She never submitted anything to ALDI in writing regarding any of her conditions. *Id.* at 72. Her understanding was that the process at ALDI for requesting FMLA leave was to communicate to her direct leader. *Id.* at 79.

Plaintiff was attending a manager's meeting in Webberville around May 26 or May 27, 2015, and had to leave in the middle of the night with ear pain. *Id.* at 137. Plaintiff called Ms. VanNatta the next day to tell her she had to leave because of her ear problems. *Id.* at 138. Plaintiff noted that Ms. VanNatta reflected on the calendar (ECF No. 31-10) that Plaintiff attended the store manager meeting and went to the hospital that week. *Id.* at 139. When asked if she did in fact go to the hospital after leaving the meeting, as the calendar reflects, Plaintiff responded that she does not recall. *Id.* at 139. When asked if she requested time off during her phone call with Ms. VanNatta, Plaintiff responded that she does not recall. *Id.*

Plaintiff testified that she first contacted Ms. VanNatta regarding FMLA on June 17, 2015. *Id.* at 85. She spoke with her on June 17th and 19th by phone and via text messages to set up an in person meeting on June 20th. *Id.* Plaintiff testified that Ms. VanNatta informed her via text message that Ms. VanNatta would need to speak to legal advisers concerning her FMLA

request prior to meeting with Plaintiff on June 20th. *Id.* Plaintiff testified that she met with Ms. VanNatta on June 20th and they discussed her options for taking time off. Plaintiff testified that they agreed she could begin leave on July 26th. *Id.* Plaintiff testified that Ms. VanNatta did not request any FMLA paper work for Plaintiff, and in fact told Plaintiff that she did not need to take any other action with respect to her request. *Id.* at 101. Plaintiff testified that she met with Ms. VanNatta again on July 20th, 2015 and had the following discussion:

> I asked her, well, Skylar, who's going to be running my store while I'm gone, and she just stared at me. Skylar? What's going on? What happened? What's going on? Who's running my store? She just stared at me. I said did you put it in, am I okay for FMLA? And she said no, I didn't, but I'm going to. I'm going to put it in. I said okay. And then she promised. I shed some tears. She shed tears. We discussed several other operational factors that were going on and concerns. She promised me she would be a better leader and a better district manager that day.

*Id.* at 107–08. Her plan to begin leave on July 26th "was completely scratched and there was not another tentative date set." *Id.* at 112. Ms. VanNatta denied discussing FMLA with Plaintiff on Jun 17th. VanNatta Dep. at 19.

Plaintiff testified that several Doctors informed her that there was a possibility of needing surgery to correct the condition she had that led to mastoiditis. *Id.* at 108. Antibiotics held her infections at bay, but she testified that she felt she needed to continue treatment at University of Michigan. *Id.* She did not have a continuing course of treatment for a particular diagnosis of mastoiditis. *Id.* at 109. She continued to work and ultimately went to the hospital again on September 6th. *Id.* at 112. During her deposition she could not recall what she was diagnosed with on that occasion, she could not recall being admitted to the hospital on that occasion, and she could not recall being told she had work restrictions. *Id.* at 116. She called her Director of Operations, Trisha Snider, on September 23rd and asked for FMLA leave. *Id.* at 116–17.

Plaintiff continued to work and kept her condition at bay with antibiotics but does not remember scheduling any appointments "during that time." *Id*. at 122. Plaintiff met with Ms. VanNatta and Ms. Snyder on September 29th and requested FMLA leave again. *Id.* at 123. When asked during her deposition what she was requesting FMLA leave for at that point, she responded: "I didn't know at that point. I just wanted a leave to get better. I mean, I had no idea at that point." *Id.* at 123. She did not know when the leave would start or how long it would last. *Id.* She testified that she needed "to go to a doctor and have them assess that," but she "wasn't given that opportunity in June when [she] tried to exercise [her] rights." *Id.* at 124. She informed Ms. Snyder and Ms. VanNatta that she had an ear condition that could lead to mastoiditis. *Id.* at 126. She does not recall ever telling Ms. VanNatta that she needed to miss work for a doctor's appointment. She testified as follows:

> . . . there were appointments I would have had to cancel anyway, which my records will reflect, and when I would go to the hospital it wasn't something that I ever knew was an emergent situation, or just comfort or needing emergent care. There was a period where Skylar was my direct leader where there was no taking a day off, there was no taking an hour off, there was no getting out of there. There was no steps, there wasn't any steps. The schedule will reflect that themselves. They're all in there. I'm the only person at ALDI that doesn't punch in, so therefore you have to take all the hours when there isn't other people.

*Id.* at 144. Plaintiff received her FMLA Notice of Eligibility and Rights and Responsibilities in the mail on October 8, 2015, the day she was terminated. *Id.* at 149. The notice was dated October 2, 2018, and indicated that she was eligible for FMLA leave. ECF No. 27-12.

Plaintiff contends she was disciplined for absences for work "at or near May 19 and May 22" when she was in the hospital. *Id.* at 151. She testified that she was disciplined for absences from work on May 19 and May 22, but could not recall if she was scheduled to work on either of those days. *Id.* at 68, 152. She felt she was disciplined by Ms. VanNatta taking away her pay but could not recall if her pay was taken away. *Id.* at 153. She also felt that she was disciplined by

Ms. VanNatta falsely indicating on the calendar that Plaintiff was on vacation in Colorado during those days. *Id.* She could not confirm if a sick day or vacation day was used for either May 19 or May 22 but she believed so. *Id.* She also felt as though she was punished by Ms. VanNatta writing her up in EIDF forms that she never saw until she was fired. *Id.* at 153–54. She also alleges that Ms. VanNatta and/or Ms. Snyder went into her personnel file and falsified disciplinary documents for violations that Plaintiff did not do. *Id.* at 154.

She alleges she was also falsely accused of being absent on June 17, the day she first requested FMLA. *Id.* at 15. She alleges she was wrongfully deducted pay for 15 of 17 pay periods in 2015. *Id.* at 155. She further explained that she was ultimately paid in full after Brian Anderson advocated on her behalf. *Id.* She contends that her payroll records reflect that she received partial paychecks reflecting the wrongful pay deductions, and supplemental paychecks after Mr. Anderson advocated to get her money back. *Id.* at 156.

Plaintiff testified that, on October 1st or 2nd, Ms. VanNatta tried to force her "to produce falsified inventory numbers to ALDI corporate" and she refused. *Id.* at 171. When asked what law this violated, Plaintiff responded "I can't tell you specific the name of the law, but I know that it would be a law of lying, fraud, some sort of white collar crime of being dishonest with numbers that are ultimately reported to the IRS from my store . . ." *Id.* at 174. When asked what Ms. VanNatta instructed her do, she explained:

> She wanted me to enter in damaged and returned product as sellable quantities into our inventory reflecting higher profit and loss and I refused to do it, which made my inventory drag on. In addition to allowing all products that were sold that day to come out of my inventory as a complete loss like disappearing ghosts. Complete loss.

*Id.* at 172–73. Plaintiff testified that she asked an employee, Jennifer Hall, to take pictures of the damaged goods and send them to her phone. *Id.* at 173. She further explained that damaged items

should be retained and reported to ALDI corporate who contacts the manufacturer or supplier. *Id.* at 176. After three months, ALDI corporate issues a disposition instructing store management on what to do with the specific damaged products, such as dispose of them or return them to the manufacturer. *Id.* at 176.

On October 8, 2015, Plaintiff was terminated for "cash handling." ECF No. 31-22. Ms. Snider made the decision to terminate Plaintiff. Snyder Dep. at 29, 35, ECF No. 27-8. The Employee Incident and Discipline Form (EIDF) notes that during a routine audit Ms. VanNatta discovered that a $100 Gift Certificate was missing. ECF No. 31-22. It was discovered that Plaintiff had used it to pay a repairmen for fixing pot holes in the parking lot. The cash handling policy provides that "the store management person may pay for any expenses up to $100 out of the management person's drawer" and further provides that "all expenses for store supplies must be approved by the store management person and the district manager with his or her signature." ECF No. 31-15. Plaintiff did not believe that gift certificates were a valid form of payment for services rendered, had never paid a vendor in gift certificates before, had never seen anyone else at ALDI do so, and only did so because her District Manager approved it. Edwards Dep. at 212. Plaintiff testified that Ms. VanNatta approved the expense and approved the method of payment. Edwards Dep. at 170, 215

The EIDF indicates that the expense was never discussed with or approved by District Manager VanNatta. ECF No. 31-22. Ms. VanNatta denies approving the expense. VanNatta Dep. at 61, ECF No. 27-10. Plaintiff did not report the expense until October 8, seven days after paying the expense. Edwards Dep. at 212. Plaintiff did not indicate in the report that Ms. VanNatta had approved the expense. *Id.* at 214. No document has been produced in which Ms. VanNatta signed off on the expense. Ms. Snider testified that she had no knowledge of Ms.

VanNatta approving the expense. Snider Dep. at 34. Plaintiff did not testify that she informed Ms. Snider that Ms. VanNatta approved the expense.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

Plaintiff asserts four claims for relief: 1) interference with the exercise of her FMLA rights; 2) retaliation for her attempts to exercise her FMLA rights; 3) termination in violation of public policy for her refusal to take part in illegal activity; and 4) discrimination based on her disability. Each will be addressed in turn.

## A.

### i.

The Family and Medical Leave Act (FMLA) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," or to retaliate or discriminate against an employee exercising FMLA rights. 29 U.S.C.A. § 2615(a)(1)-(2). Sixth Circuit precedent recognizes two distinct theories of recovery for FMLA wrongdoing. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). The "entitlement" or "interference" theory arises from § 2615(a)(1), which prohibits an employer from interfering with an employee's exercise of her FMLA rights or wrongfully denying those rights, and requires the employer to restore the employee to the same or an equivalent position upon her return from FMLA leave. *Id.* The "retaliation" theory, on the other hand, arises from § 2615(a)(2), which prohibits an employer from taking any adverse action against an employee for exercising or attempting to exercise her rights under the Act. *Id.*

To establish a claim for interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016). "A benefit is denied if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave." *Id.*

There is no dispute as to elements one and two. The parties do, however, dispute whether Plaintiff was entitled to leave under the FMLA. Under the FMLA, an eligible employee is entitled to take twelve workweeks of leave during any 12-month period "because of a serious

health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(l)(D); 29 C.F.R. § 825.112(a)(4).

"For purposes of FMLA, serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.113. Inpatient care, in turn, "means an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114. "Continuing treatment by a health care provider" includes, among other things,

> (c) Chronic Conditions. *Any period of incapacity or treatment for such incapacity* due to a chronic serious health condition. A chronic serious health condition is one which:
>
>> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
>>
>> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>>
>> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)

29 C.F.R. § 825.115(c) (emphasis added).

The term incapacity means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

**ii.**

Defendant argues that incapacity is a threshold issue to establish a serious health condition under the FMLA, and that Plaintiff suffered no period of incapacity as a result of the

condition for which she requested leave. Mot. at 13 (citing Taylor, 706 F. Supp. 2d at 850).

Defendant notes that: 1) "No medical provider determined that Plaintiff could not work because

of her ear condition or recommended or instructed that Plaintiff take time off work due to her ear

condition," 2) "Plaintiff admits her ear condition did not impact her ability to perform her job as

an ALDI Store Manager or her ability to perform daily tasks outside of work," and 3) "No doctor

told Plaintiff she had work restrictions because of her ear condition." Mot. at 8, 15 (citing

Edwards Dep. at 36:22-37:1, 42:2-8, 46:16-20, 46:21-25, 47:6-13, 58:17-20, 108:2-18, 116:16-

19). Defendant also notes that not all medical problems are subject to the FMLA, and that "the

Sixth Circuit has concluded that an ear condition like Plaintiff's is a 'routine, short term illness[]

not covered by the FMLA." *Id.* at 16 (citing *Beaver v. RGIS Inventory Specialists, Inc.*, 144 F.

App'x 452, 456 (6th Cir. 2005); *Nawrockiv v. United Methodist Ret. Communities, Inc.*, 174 F.

App'x 334, 337 (6th Cir. 2006) ("an ear infection is not considered to be a serious health

condition unless complications develop.").

 In response, Plaintiff offers the following analysis:

> The record evidence summarized above demonstrates that Plaintiff suffered from
> a medical condition involving dysfunction in the TMJ, which in turn caused
> chronic and persistent ear infections, pain, and discharge along with facial
> swelling. Plaintiff's medical history reveals that Plaintiff required periodic visits,
> at least twice per year, for the condition. The condition continued to cause
> Plaintiff symptoms over an extended period of time, including several years. The
> medical condition further caused episodic periods of incapacity. Plaintiff's
> medical condition, which is far from a fleeting occasional ear infection, met the
> definition of a chronic serious health condition. Because Plaintiffs condition met
> the definition of a chronic serious health condition, Plaintiff was entitled to
> FMLA leave.

Resp. at 14–15. Thus, Plaintiff's analysis essentially consists of a brief description of her

condition, a recitation of the definition of a chronic serious health condition under 29 C.F.R. §

825.115(c), and a conclusory assertion that her condition constitutes a chronic serious health

condition. This falls well short of Plaintiff's burden to identify evidence supporting her claim. *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) ("The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations."). Plaintiff offers no citation to the factual record, nor does she identify the periodic visits or episodic periods of incapacity she is referring to. Rather, Plaintiff simply refers the Court to "the record evidence summarized above" which allegedly demonstrates that she suffered from a chronic serious medical condition. Resp. at 14. However, Plaintiff's responsibility at the summary judgment stage requires more. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones*.") (emphasis added). Plaintiff cannot simply recite all facts it learned during discovery and then, at the analysis stage, invite the Court to explain the legal relevance of those facts.

This is particularly true where, as here, Defendant has satisfied its burden to point to evidence in the record demonstrating that Plaintiff was not incapacitated. The term "incapacity" means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). As Defendant notes, there is no evidence in the record that a medical provider ever determined that Plaintiff could not work because of her ear condition. Plaintiff testified that her condition did not prevent her from performing her job. 36:22-37:1; 47:6-13. When asked if her ear condition impacted her daily life activities, Plaintiff responded "no, I just did them" and later responded that she "pushed through, pain or no pain." Edwards Dep. at, 36:22-37:1; 46:16-25.  No medical

provider imposed any work restrictions on Plaintiff because of her ear condition. 42:2-8, 58:17-20, 116:16-19. Plaintiff does not attempt to rebut this evidence by offering any factual or legal support for her assertion that she suffered a period of incapacity (episodic or otherwise) under 29 C.F.R. § 825.115(c) and 29 C.F.R. § 825.113(b). Because there is no genuine dispute of fact as to whether Plaintiff suffered from a serious health condition under 29 C.F.R. § 825.113, summary judgment will be granted for Defendant on Plaintiff's FMLA interference claim.

### B.

### i.

"Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To establish a prima facie case of FMLA retaliation, a plaintiff must show "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

Once the plaintiff has carried its burden to establish a prima facie case of FMLA retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). To carry this burden, a defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07) (citations and quotations omitted).

Finally, once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the employer's proffered reason for the adverse decision was a pretext for unlawful retaliation. *Id.* A plaintiff can rebut the employer's proffered reason by showing that it had no basis in fact, did not actually motivate the adverse decision, or was insufficient to warrant the adverse decision. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Although temporal proximity between the protected FMLA activity and the adverse decision can be sufficient to establish Plaintiff's prima facie case, such temporal proximity alone cannot establish pretext. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001). When evaluating the basis for the employer's decision, the employer is entitled to the benefit of the honest belief rule. *Donald*, 667 F.3d 757, 763.

**ii.**

Here, Plaintiff has offered no direct evidence of retaliation. Accordingly, the burden shifting framework established in *McDonnell Douglas* applies. *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802).

Defendant contends that Plaintiff cannot establish a prima facie case of FMLA retaliation because, as explained above, Plaintiff has not demonstrated a serious health condition. Defendant quotes *Glander* for the proposition that "The Sixth Circuit has expressly adopted the approach that an employee does not engage in activity protected by the FMLA where a serious health condition has not been demonstrated." *Glander v. NGK Spark Plugs, Inc.*, 2012 WL 5828620, at *7 (E.D. Mich. Oct. 25, 2012) (citing *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 338 (6th Cir. 2009) ("Because [plaintiff's] leave was not on account of a serious health condition, he cannot establish the first element [of the retaliation claim], that he engaged in an activity protected by the FMLA.")). Published district court precedent also supports the

proposition that a plaintiff must have a serious medical condition to establish that he or she was engaged in protected activity under the FMLA. *See, e.g.*, *Fritz v. Phillips Serv. Indus.*, Inc., 555 F. Supp. 2d 820, 836 (E.D. Mich. 2008); *Linebarger v. Honda of Am. Mfg., Inc.*, 870 F. Supp. 2d 513, 523 (S.D. Ohio 2012). Notably, however, there does not appear to be any published authority from the Sixth Circuit Court of Appeals supporting this proposition.

In *Johnson*, the court offered a thorough overview of the different approaches to this issue, as well as the statutory and public policy rationales underlying the different approaches. *Johnson v. Dollar Gen.*, 880 F. Supp. 2d 967, 992 (N.D. Iowa 2012), *aff'd,* 508 F. App'x 587 (8th Cir. 2013). The court underscored the fact that 29 U.S.C.A. § 2615(a) protects both the exercise *and the attempted exercise* of FMLA rights. *Id.* The court observed that nothing in the statute requires "that the attempt to exercise FMLA rights *ultimately would be successful*, absent the employer's interference." *Id.* Therefore, the court concluded that a retaliation claim "does not require proof that the plaintiff actually suffered a "serious health condition," only that the plaintiff gave adequate and timely notice to the employer that he or she needed leave for a condition that the plaintiff believed, in good faith, might be covered by the FMLA." *Id.*

This approach does not appear to have gained support in the Sixth Circuit. Even applying this approach to Plaintiff's FMLA retaliation claim, however, the claim still fails. There is no evidence that Plaintiff believed in good faith she was requesting time off for a condition that might be covered by the FMLA. Indeed, the record indicates that Plaintiff was frustrated with her condition but did not know why she was requesting time off, had no medical appointments scheduled, and had no medical justification for requesting time off. When asked why she requested leave in September of 2015, Plaintiff testified "I didn't know at that point. I just wanted a leave to get better. I mean, I had no idea at that point." *Id.* at 123. She did not know

when the leave would start or how long it would last. *Id.* She testified that she needed "to go to a doctor and have them assess that," but she "wasn't given that opportunity in June when [she] tried to exercise [her] rights." *Id.* at 124. When asked why she requested leave in June of 2015, Plaintiff responded:

> A: It was for me to get my ears taken care of at that point and be able to take some time off where I could keep committed appointments and do follow-up treatment and preventative and get this taken care of once and for all, things that I had not been able to do under the scrutiny of ALDI all the hours and working so far away.
>
> Q: Was your request – it was for continuous leave?
>
> A: My request was so that I could get better. I don't know how long that was going to take because I was never given the opportunity to go to a doctor to find out what we going to do for a treatment plan. That happened eight days before I was fired – or I'm sorry, three days before I was fired or four days, the week I was fired.
>
> Q: So it's not that there was a particular appointment scheduled for July 26th?
>
> A: No.
>
> Q: There's not a surgery scheduled?
>
> A: No.
>
> Q: Did you have any particular appointments scheduled June – July 26th or shortly thereafter?
>
> A: July 26th is a Sunday. No, it was just when I was going to be taken off to finally, you know, pursue getting all of – getting my ears fixed once and for all.
>
> Q: When you say taken off, does that mean you would be off work for a period of time?
>
> A: I was hoping to be, to focus on my health and to get it repaired and get back to being a great store manager that I was.
>
> Q: Did you have any particular amount of time in mind?

A: No, I did not. I was never given that opportunity for a doctor to assess that.

Q: So when you sit down with Skylar on June 20th you select – together you select July 26th as being off work for an indefinite period of time?

A: No, not – not for an indefinite period of time. This was – I mean, at that time a doctor would have been able to say how long I probably could have been off, but I didn't receive any paperwork. I wasn't able to go and get an assessment by a doctor for us to get a projected treatment plan or a diagnosis or an estimated time off so that I could communicate that back, and I didn't know she didn't put in my FMLA until nearly a month later, which would have been six days before that scheduled date.

Q: Did you make any appointments in the meantime? Did you make an appointment –

A: No. No, I didn't make appointment. The store was completely shy staffed.

*Id.* at 96–98. In short, Plaintiff had no continuous course of treatment with a health care professional requiring her to attend any future appointments. Her Doctors had never opined that she could not work or that she had any work restrictions. She herself did not believe that she could not work or had any work restrictions. When Plaintiff requested leave, she had not scheduled any health care appointments. Plaintiff wanted to take time off in order to develop some sort of action or treatment plan to help manage her condition, but had taken no steps toward doing so when she requested leave. Even under the approach adopted by the *Johnson* court, Plaintiff did not engage in protected activity when she requested time off to formulate an action plan for her ear condition.

Furthermore, even if Plaintiff had engaged in protected activity, her retaliation claim still fails because she cannot establish causation. Although the temporal proximity between her leave request and the adverse action that occurred 10 days later is sufficient to establish a prima facie case, she must also address the Defendant's rationale for the termination. *Bryson v. Regis Corp.*,

498 F.3d 561, 571 (6th Cir. 2007) (holding that the three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here, Defendant has proffered a legitimate, non-retaliatory reason for the termination, and Plaintiff cannot establish that the reason was pretextual. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

On October 8, 2015, Plaintiff was terminated for "cash handling." ECF No. 31-22. Ms. Snider made the decision to terminate Plaintiff. Snyder Dep. at 29, 35, ECF No. 27-8. The Employee Incident and Discipline Form (EIDF) notes that during a routine audit Ms. VanNatta discovered that a $100 Gift Certificate was missing. ECF No. 31-22. It was discovered that Plaintiff had used it to pay a repairman for fixing pot holes in the parking lot. The cash handling policy provides that "the store management person may pay for any expenses up to $100 out of the management person's drawer" and further provides that "all expenses for store supplies must be approved by the store management person and the district manager with his or her signature." ECF No. 31-15. Plaintiff did not believe that gift certificates were a valid form of payment for services rendered, had never paid a vendor in gift certificates before, had never seen anyone else at ALDI do so, and only did so because her District Manager approved it. Edwards Dep. at 212. Plaintiff testified that Ms. VanNatta approved the expense and approved the method of payment. Edwards Dep. at 170, 215

The Employee Incident and Discipline Form (EIDF), however, indicates that the transaction was never discussed with or approved by District Manager VanNatta. ECF No. 31-22. Ms. VanNatta denies approving the expense. VanNatta Dep. at 61, ECF No. 27-10. Plaintiff did not report the expense until October 8, seven days after paying the expense. Edwards Dep. at 212. Plaintiff did not indicate in the report that Ms. VanNatta had approved the expense. *Id.* at

214.  No document has been produced in which Ms. VanNatta signed off on the expense. Ms. Snider was asked "Did you know that – did Ms. VanNatta ever tell you that not only was she aware of what the Plaintiff was doing as far as paying in certificates, but the she said it was a win-win . . .?" Snider Dep. at 34. Ms. Snider responded "I have no knowledge of that." *Id*. Plaintiff did not testify that she informed Ms. Snider that Ms. VanNatta approved the expense.

A plaintiff can rebut the employer's proffered reason by showing that it had no basis in fact, did not actually motivate the adverse decision, or was insufficient to warrant the adverse decision. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Plaintiff does not dispute that she paid for pothole repairs with gift certificates. Rather, she contends that this was insufficient to warrant termination because there is a factual question as to whether she was authorized to complete the transaction. Plaintiff notes that the cash handling policy provides that "the store management person may pay for any expenses up to $100 out of the management person's drawer" and further provides that "all expenses for store supplies must be approved by the store management person and the district manager with his or her signature." ECF No. 31-15. The policy does not, however, permit management to pay in gift certificates.

Furthermore, Plaintiff's contention that the transaction was authorized by the policy is belied by her own testimony that 1) she did not believe that gift certificates were a valid form of payment for services rendered, 2) she had never paid a vendor in gift certificates before, 3) she had never seen anyone else at ALDI do so, and 4) she would not have done so absent approval from her District Manager. Edwards Dep. at 212. Thus, based on Plaintiff's own testimony, the sole fact that excused her conduct was the fact that Ms. VanNatta authorized the transaction.

Plaintiff argues that there is a question of fact as to whether Ms. VanNatta authorized the transaction, and further contends that "if a factfinder believed Plaintiff's testimony on this point,

Defendant would then have terminated Plaintiff for actions that had been approved by Defendant." Resp. at 17. Indeed, the facts on this point are disputed, as Ms. VanNatta denies approving the expense. VanNatta Dep. at 61. However, this is not a *material dispute*, because its resolution would not change the outcome. Ms. VanNatta did not make the termination decision. Rather, Ms. Snider did. Snider Dep. at 29, 35, ECF No. 27-8. Had Plaintiff informed Ms. Snider that Ms. VanNatta authorized the transaction, Ms. Snider would have had no legitimate basis to terminate Plaintiff. However, Ms. Snider testified that she had no knowledge of the transaction being authorized by Ms. VanNatta. Snider Dep. at 34. Plaintiff offers no evidence, testimonial or otherwise, that she informed Ms. Snider that the transaction was authorized by Ms. VanNatta. Under the honest belief rule, the employer is entitled to reasonably rely on a particularized set of facts that were before it when the adverse decision was made. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). This holds true even if the decision is "later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009).

Simply put, Plaintiff's justification for the transaction, namely that Ms. VanNatta approved it, was not one of the particularized facts before Ms. Snider when she made her decision. Plaintiff cannot establish a question of material fact as to pretext by advancing a post hoc rationalization for her conduct. Her rationalization must have been shared with the decision maker in the first instance.

Plaintiff identifies miscellaneous other actions by Ms. VanNatta that allegedly demonstrate pretext. Plaintiff contends that Ms. VanNatta went to great lengths to "build a file" against Plaintiff to justify the adverse action. Resp. at 18. Plaintiff asserts that Ms. VanNatta incorrectly indicated on the calendar that she was out on vacation during the week of May 22. Plaintiff does not explain how this constitutes "building a file" against Plaintiff to justify adverse

action, nor does Plaintiff provide evidence that her time off during the week of May 22 was a motivating factor in the termination decision. Plaintiff also claims that Ms. VanNatta "solicit[ed] subordinate employees to share complaints about Plaintiff." *Id.* Notably, Plaintiff does not furnish any evidence that Ms. VanNatta sought complaints for the purpose of building a file against Plaintiff, nor does Plaintiff explain why it is inappropriate for a district manager to obtain feedback from store employees' regarding their manager. Furthermore, Plaintiff does not contend that the employee complaints were false.

Additionally, Plaintiff alleges that, "[a]fter Plaintiff's termination, Ms. VanNatta peppered Plaintiff's file with employee incident forms suggesting that Plaintiff was being disciplined when she was not." Resp. at 19. Notably, the July 7, 2015 incident form was signed on July 13. ECF No. 31-12. Thus, there was no evidence that it was prepared after her termination on October 8. Plaintiff notes that the form was edited and a new copy was signed on October 20. ECF No. 31-21. Plaintiff does not, however, explain the significance of those edits or how they demonstrate an intent to build a false file against her.

Notably, the September 29 and October 8 incident reports were signed on October 20, and 21. ECF Nos. 20, 22. Plaintiff contends that Ms. VanNatta "made it appear that Plaintiff's transfer" was a result of the June 17, 2015 employee complaints. Resp. at 12. Specifically, the form provides that "In July of 2015, Jennifer Edwards was moved from store 53 to store 56 after the staff reached out to the district manager with concerns pertaining to Jennifer." ECF No. 31-20. Plaintiff does not, however, dispute the accuracy of that statement or the accuracy of the employee complaints themselves. Plaintiff does not dispute the specific factual information contained in the employee incident reports or explain how these reports demonstrate an intent to create a false file against her. The mere fact that the September 29 and October 8 incident reports

were not signed until October 20 and 21 is not sufficient evidence upon which a reasonable jury could find that the termination decision was pretextual.

Finally, Plaintiff contends that Ms. VanNatta "scoured security footage to try to find Plaintiff engaging in misbehavior," and used that security footage to "spy on Plaintiff and help build a file" against her. *Id.* at 19. Plaintiff does not explain how a district manager's act of reviewing video footage from one of her stores constitutes spying, nor does she explain how it is probative of retaliatory intent. Most importantly, Plaintiff does not dispute the accuracy of any conclusions Ms. VanNatta reached based on her review of the security footage.

Because Plaintiff did not engage in protected conduct under either test outline above, and because Plaintiff has furnished no evidence upon which a reasonable jury could find that Defendant's legitimate, non-retaliatory reason was pretextual, Defendant will be granted summary judgment on Plaintiff's FMLA retaliation claim.

## C.

### i.

Michigan courts have held that some grounds for discharging an employee are so contrary to public policy as to be actionable. *Suchodolski v. Michigan Consolidated Gas Co.,* 412 Mich. 692, 695 (1982). Courts recognize that a discharge may be against public policy when: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty, (2) the employee is discharged for the failure or refusal to violate the law in the course of employment, and (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment. *Edelberg v. Leco Corp.,* 236 Mich. App. 177, 180 (1999). "The public policy cited in

a wrongful termination claim must be based on an objective legal source." *Irwin v. Ciena Health Care Mgmt., Inc.*, 2013 WL 5495560, at *1 (Mich. Ct. App. Oct. 3, 2013).

**ii.**

When asked what Ms. VanNatta instructed Plaintiff to do that allegedly violated the law, Plaintiff explained:

> She wanted me to enter in damaged and returned product as sellable quantities into our inventory reflecting higher profit and loss and I refused to do it, which made my inventory drag on. In addition to allowing all products that were sold that day to come out of my inventory as a complete loss like disappearing ghosts. Complete loss.

*Id.* at 172–73. When asked what law this violated, Plaintiff responded "I can't tell you specific the name of the law, but I know that it would be a law of lying, fraud, some sort of white collar crime of being dishonest with numbers that are ultimately reported to the IRS from my store . . ." *Id.* at 174. Plaintiff testified that she asked an employee, Jennifer Hall, to take pictures of the damaged goods and send them to her phone. *Id.* at 173. She further explained that damaged items should be set aside, retained on site, and reported to ALDI corporate who contacts the manufacturer or supplier. *Id.* at 176. After three months, ALDI corporate issues a disposition instructing store management on what to do with the specific damaged products, such as dispose of them or return them to the manufacturer. *Id.* at 176. Plaintiff further testified as follows:

> we've put in a request for this and have not received this disposition yet and I can't wait to lay my eyes on it because I guarantee you for store No. 56 there's not one item that has direction to throw out because they all were entered by Skylar VanNatta into that handheld as sellable products, leaving ALDI no direction to give me on returns because I wouldn't have had any, but unfortunately I wasn't there to received that disposition, I was gone, fired. But I know that that disposition will say zero quantities because I had nothing to throw out. I also talked to the camera that day during it. I've requested the footage for that as well. I'm speaking to the camera. I'm talking to the camera. I'm telling them that what she is doing is against the law. I'm going like this with my neck. I also did a duplicate receipt of that total that I valued and I wrote on there . . . to whom this may concern, when you come looking for me this is what you're

looking for. And I folded that receipt and I tucked it away in the middle of the Q3 2015 clear box at ALDI store 56 on Bay Road and I've put in a request for but have not yet to receive. I also took pictures of the items in questioned – in question, and I sent them directly to Skylar's phone, and we conversated at that time. I told her when this ship goes down I'm not going with you. I'm not doing this.

Q: So other than this day, that issue, the damaged product entering into MDT, any other requests from Skylar to fraudulently alter inventory?

A: No, no other request for that. Just the recording of what she does when she only asks for credit and doesn't give credit back to the warehouse internal. I call them internal and external. The first one I recorded was internal. The second one she was asking me to report externally ALDI corporate to the government.

Q: ALDI corporation to the government?

A: They take those papers and they  -- ALDI uses that to disclose information to report that to the government. Store-specific profit and loss combined as a division and then report it. That paper also does not have my signature on it. I refused to sign it.

*Id.* at 177–79.

Plaintiff offers nothing more than her testimony to support her argument that she was asked to break the law. Her explanation is, at best, hard to follow. She did not support this explanation by producing any of the evidence that she testified would establish the alleged wrongdoing. Plaintiff did not produce the inventory disposition[3] sent from ALDI Corporate, the inventory reconciliation submitted to ALDI corporate, the pictures Plaintiff took of the damaged goods, the pictures Jennifer Hall took of the damaged goods, any testimony from Jennifer Hall, the duplicate receipt on which Plaintiff wrote her message, the video footage of Plaintiff explaining the illegal activity to the camera, or the "store-specific profit and loss" disclosed to the government that Plaintiff refused to sign. This evidence might have painted a clearer picture of what Plaintiff is alleging. Plaintiff indicated during her deposition that much of this evidence

---

[3] Plaintiff testified that the disposition comes in quarterly. *Id.* at 176.

has been requested. However, Plaintiff never moved to compel the production of this evidence or

otherwise apprised the Court of any difficulty obtaining it.

In her response brief, Plaintiff argues as follows:

The Michigan penal code has several provisions prohibiting fraud, including a prohibition on fraudulent disposition of personal property. MCL 750.279 prohibits individuals who have been put in charge of goods or other personal property from fraudulently using those goods or property for purposes other than those intended. Ms. VanNatta fraudulently labeling damaged goods as sellable and as having value. Ms. VanNatta instructed Plaintiff to participate in the fraud. Plaintiff refused to do so. Plaintiff submits that by refusing to participate in the fraud, a genuine issue of material fact exists whether Plaintiff failed and/or refused to violate the law and, therefore, engaged in protected activity.

Resp. at 20–21. With nothing but Plaintiff's testimony to rely on, there is simply no reasonable

inference that can be drawn that Ms. VanNatta violated MCL 750.279 or asked Plaintiff to do so.

MCL 750.279 provides as follows:

Fraudulent disposition of personal property—Whenever money, or any goods, wares or merchandise or other personal property, shall be delivered, committed or entrusted to, or put in charge of any person as agent with written instructions, or upon any written agreement signed by the party so instructed as agent, or such written instructions shall be delivered or such written agreement shall be made, at any time after delivery to such agent, of any money or goods, wares, merchandise, or other personal property, which instructions or agreements shall express the appropriation, purpose, or use to which such money shall be applied, or the terms, mode or manner of the application or employment of such money, or which shall express or direct the disposition or use to be made by such agent, of any goods, wares, merchandise or other personal property, so delivered or entrusted to such agent; if the person to whom any such money or goods, wares, merchandise or other personal property shall be so delivered, committed or entrusted, shall purposely and intentionally apply, appropriate, dispose of, or use any such money or goods, wares, merchandise or other personal property in any other way or manner, or for any other purpose, use or intent, than such as shall be expressed in such written instrument or agreement touching the same, the person or persons so doing, shall be guilty of felony.

Labelling damaged store inventory as sellable would not violate MCL 750.279, as it

would not involve applying, appropriating, disposing, or using the personal property of another.

Plaintiff offers no legal citation or explanation as to how the alleged conduct would violate MCL

750.279. Indeed, there are very few published cases involving violations of MCL 750.279. In each of those cases the conduct at issue involved misappropriation of money entrusted to an agent. *See, e.g.*, *People v. Madsen*, 110 Mich. App. 386, (1981) (misappropriation of money by an insurance agent who failed to turn over the money to the insuring company he represented); *People v. Ritchie*, 145 Mich. 440, 442 (1906) (misappropriation of money by clerk of brokerage agent where customer entrusted money to him for the purchase of stock); *People v. Karste*, 132 Mich. 455, (1903) (misappropriation by brokerage agent of money entrusted to him by a customer for the purchase of stock).

When Ms. VanNatta allegedly mislabeled damaged store inventory as sellable, she did not "apply, appropriate, dispose of, or use" those goods. Indeed, Plaintiff alleges that the goods remained at the store for purchase by customers. Plaintiff simply contends they should have been separated from the sellable inventory, and ultimately discarded or returned to the manufacturer, depending on instructions from ALDI corporate. Thus, there is no question of fact as to whether Ms. VanNatta instructed Plaintiff to violate MCL 750.279 when she allegedly instructed her to enter damaged inventory into the system as sellable inventory.

## D.

### i.

To establish a prima facie case of discrimination under the Persons with Disabilities Civil Rights Act (PWDCRA), a plaintiff must show 1) that she is disabled as defined by the Act; (2) that the disability was unrelated to her ability to perform her job duties; and (3) that she has been discriminated against in one of the ways delineated in the act. *Peden v. Detroit,* 470 Mich. 195, 204 (2004). If the plaintiff establishes a prima face case of disability discrimination under the PWDCRA, the defendant must articulate a legitimate, nondiscriminatory reason for the

termination. *Till v. Spectrum Juvenile Justice Servs.*, 805 F. Supp. 2d 354, 362 (E.D. Mich. 2011). If the defendant can articulate such a reason, the burden shifts back to the plaintiff to prove that the proffered reason is pretextual. *Id.*

A "disability," is defined in MCL 37.1103(d) as: (i) "[a] determinable physical or mental characteristic of an individual . . . if the characteristic: (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position . . ."; (ii) "[a] history of a determinable physical or mental characteristic . . ."; or (iii) "[b]eing regarded as having a determinable physical or mental characteristic . . ." *Id.* (citing MCL 37.1103(d)).

## ii.

Plaintiff cannot establish a prima facie case of disability discrimination, because she has presented no evidence that she suffers from a physical or mental characteristic that substantially limits 1 or more major life activities. Indeed, when asked if her ear condition impacted her daily life activities, Plaintiff responded "no, I just did them" and later responded that she "pushed through, pain or no pain." Edwards Dep. at 36:22-37:1, 46:16-25.

Plaintiff directs the Court to her declaration in which she testified: "That the medical conditions I experience substantially limit several life activities." Resp. at 22 (citing Edwards Decl. at ¶, ECF No. 31-15.). That statement will be disregarded, however, as it attempts to create a sham issue of fact. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 at 806 (1999) (noting that circuit courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment by contradicting his or her own previous sworn statement (by, say,

filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").[4]

Plaintiff's declaration is dated February 12, 2018. The declaration flatly contradicts her earlier deposition testimony from October 16, 2017. Plaintiff makes no attempt to explain the contradiction or resolve the disparity. Thus, the statement in the affidavit must be disregarded.

Furthermore, Plaintiff's PWDCRA claim would fail even if her declaration was given full effect and she established her prima facie case. Her PWDCRA claim would still fail because, as explained above, she has furnished no evidence upon which a reasonable jury could find that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff was pretextual. Therefore, summary judgment will be granted for Defendant on Plaintiff's PWDCRA claim.

## IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 27, is **GRANTED**.

It is further **ORDERED** that the complaint, ECF No. 1, is **DISMISSED.**

It is further **ORDERED** that the motion to amend/correct the scheduling order, ECF No. 26, is **DENIED** as moot.

It is further **ORDERED** that the motion to file supplemental exhibits, ECF No. 33, is **GRANTED.**

It is further **ORDERED** that the motion in limine, ECF No. 35, is **DENIED** as moot.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 9, 2018

---

[4] An affidavit is not a "sham" however, where it supplements the previous sworn deposition. *Aerel*, 448 F.3d at 908 (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 9, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager